# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,

        Plaintiff,                              **Criminal No. 14-32 (ADM/SER)**

v.

Tommy Michael Spack,                **REPORT AND RECOMMENDATION**

        Defendant.

---

    Surya Saxena, Esq., United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Plaintiff.

    Kyle D. White, Esq., 332 Minnesota Street, Suite W-1710, St. Paul, Minnesota 55101, for Defendant.

---

STEVEN E. RAU, United States Magistrate Judge

    The above-captioned case comes before the undersigned on Defendant Tommy Michael Spack's ("Spack") Motion for Suppression of Statements ("Mot. to Suppress Statements") [Doc. No. 13] and Motion to Suppress Evidence Obtained through Illegal Search and Seizure ("Mot. to Suppress Evidence") [Doc. No. 14]. This matter has been referred to the undersigned for the resolution of the issues raised in Spack's Motions pursuant to 28 U.S.C. § 636(b)(1)(B)–(C) and District of Minnesota Local Rule 72.1. For the reasons stated below, this Court recommends denying Spack's Motions.[1]

---

[1]     Plaintiff the United States of America's (the "Government") Motion for Discovery Pursuant to Federal Rules of Criminal Procedure 16(b), 12.1, 12.2, 12.3, and 26.2 [Doc. No. 9], and Spack's Motion to Compel the Government to Disclose Evidence Favorable to the Defendant [Doc. No. 15] were addressed in a separate Order on March 12, 2014. [Doc. No. 21].

**I.    BACKGROUND**

On February 3, 2014, the Government indicted Spack with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  (Indictment) [Doc. No. 5 at 1–2]. At the pretrial motions hearing on March 12, 2014, this Court heard testimony from St. Paul Police Department ("SPPD") Officer Tim Filiowich ("Officer Filiowich") and received into evidence Government Exhibit 1, a copy of the squad video from the night in question; Government Exhibit 2, a recording of the custodial interview from after the arrest; and Government Exhibit 3, a copy of the *Miranda* form read to and signed by Spack.  (Ex. & Witness List) [Doc. No. 18].  At the request of the parties, the Court ordered supplemental briefing.  (Order for Supplemental Briefing) [Doc. No. 24].  Spack submitted his supplemental brief on April 3, 2014, and the Government submitted its response on April 10, 2014.  (Spack's Mem. in Supp. of Mot. to Suppress, "Spack's Mem. in Supp.") [Doc. No. 26]; (Gov't's Resp. in Opp'n to Mots. to Suppress, "Gov't's Resp.") [Doc. No. 27].  Spack did not file a reply although the Court permitted him to do so.  *See* (Order for Supplemental Briefing) (setting April 15, 2014, as the date by which Spack was required to file a reply if he felt it necessary).  This case is set for trial before United States District Judge Ann D. Montgomery on May 12, 2014.  (Order Dated Mar. 27, 2014) [Doc. No. 25].

**II.    FACTS**

On December 14, 2013, at approximately 1:00 a.m., SPPD Officer Jeffrey Cragg ("Officer Cragg") and Officer Filiowich were on a routine patrol in St. Paul, Minnesota.[2]  (Tr. of Arraignment and Mots. Hr'g Held on Mar. 12, 2014, "Tr.") [Doc. No. 23 at 5].  Officer Cragg was the driver of the squad and Officer Filiowich was in the front passenger seat.  (*Id.* at 6).  As

---

[2]    The roads were icy on December 14, 2013.  (Transcript at 21).

they were driving northbound bound on Van Dyke, the Officers noticed a dark colored Mitsubishi Sports Utility Vehicle, with its engine running in the driveway of 1831 Case Avenue. (*Id.* at 5, 9). This house was familiar to Officer Filiowich because he had made multiple arrests, primarily for narcotics, at the address, and the vehicle in the driveway piqued his interest. (*Id.* at 5–6). As the Officers proceeded past the house, Officer Filiowich continued to watch the Mitsubishi. (*Id.* at 6). When the Officers saw the Mitsubishi back out of the driveway and drive southbound on Van Dyke, they made a U-turn and followed the vehicle. (*Id.* at 6–7). The squad followed the Mitsubishi, for approximately four blocks. (*Id.* at 7). When the Mitsubishi approached the intersection of Van Dyke and Stillwater, it slowed to make a right turn without coming to a complete stop, according to Officer Filiowich. (*Id.*).

Officer Filiowich testified that he had been trained to watch the tires on a vehicle to determine whether it had come to a complete stop. (*Id.*). Officer Filiowich stated that he and Officer Cragg had a conversation, lasting only a couple of seconds, about whether the vehicle had come to a complete stop at the stop sign. (*Id.* at 7–8, 26–27). The Officers determined that the Mitsubishi's tires had not stopped spinning at the stop sign, thus, warranting probable cause for a traffic stop. (*Id.* at 7–8).[3] The squad's flashing lights turned on as soon as the Mitsubishi accelerated and started to turn right. (*Id.* at 22); *see* (Gov't's Ex. 1). The Mitsubishi pulled over immediately. (Tr. at 10); (Gov't's Ex. 1).

The Officers exited the squad, and Officer Cragg approached the driver's side of the Mitsubishi while Officer Filiowich approached the passenger side. (Transcript at 10). Officer Filiowich recognized the driver as Spack because the two had interacted previously. (*Id.* at 10,

---

[3]   There was no audio recording presented at the hearing of this conversation between the Officers and the conversation cannot be heard on Government Exhibit 1. *See* (Gov't Ex. 1).

12). Although it was not documented in the police report, Officer Filiowich testified that he and Officer Cragg confirmed Spack's identity and documented his date of birth after requesting Spack's license. (*Id.* at 10–11, 23, 27). Spack was the sole occupant of the vehicle, and appeared nervous because his head was down, was not answering questions clearly or loud enough, seemed evasive, was looking away from the Officers, and was breathing very heavily. (*Id.* at 11–12).

The Officers asked Spack if there was anything illegal in the vehicle and Spack responded that he did not know because other people had used the Mitsubishi and could have left something in there. (*Id.* at 12–13). Officer Filiowich asked Spack to clarify his response, but Spack persisted with his response of not knowing if there were illegal materials in the vehicle. (*Id.* at 13). The Officers noticed a backpack in the rear seat and asked if the backpack belonged to Spack; Spack confirmed the backpack was his. (*Id.*). After Officer Filiowich asked Spack if he could look into the backpack, Spack reached into the rear seat to grab the backpack and threw the backpack on the front passenger seat, saying that he consented to Officer Filiowich looking in the backpack. (*Id.*). When the backpack landed on the front passenger seat, Officer Filiowich was able to see the contents of the partially open backpack with the aid of his flashlight; he saw a small, square, black scale with white powder on it. (*Id.* at 14). Based on Officer Filiowich's training and experience, he believed without doubt that this object was a scale used for weighing narcotics. (*Id.*). Officer Filiowich announced to Officer Cragg what he saw in the backpack. (*Id.* at 14–15). Officer Cragg then asked Spack if he had anything else illegal in the vehicle, to which Spack responded that there was a small bag of methamphetamine in the ashtray. (*Id.* at 15).

The Officers removed Spack from the vehicle, and as Officer Cragg placed him in the back of the squad, Officer Filiowich began searching the vehicle. (*Id.*). Officer Filiowich found another digital scale in the backpack, a small glass pipe commonly used to smoke narcotics, and a small Ziploc bag from the ashtray that was suspected to contain methamphetamine. (*Id.* at 16). The search next focused on the passenger seat and a loaded .38 revolver was found. (*Id.*). At this time, Spack was placed under arrest. (*Id.*). The Officers then transported Spack to be booked into jail. (*Id.*).

Spack gave an audio-recorded statement after being taking into custody and advised of his *Miranda* rights. (*Id.* at 17–20). Spack also initialed and signed a *Miranda* form to acknowledge his understanding of his waiver of rights. (*Id.*). Spack agreed to speak with the Officers and gave a statement. (*Id.*).

### III.   DISCUSSION

Spack claims he was not given his *Miranda* rights as the circumstances required when he was questioned by the Officers while in his vehicle; therefore, he asserts, his statements to the Officers should be suppressed. (Spack's Mem. in Supp. at 5–8). Spack also argues that because his statements were made as a result of a custodial interrogation, the fruit of the search—the items seized from his vehicle—ought to be suppressed. (*Id.* at 8–9).

####    A.   Motion to Suppress Statements

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court adopted measures to ensure that a suspect is advised of his or her Fifth Amendment rights before custodial interrogations. 384 U.S. 436, 444–45 (1966). Consequently, "*Miranda* prohibits the government from introducing evidence of a defendant's statements made

during a custodial interrogation, unless the defendant has been previously advised of the Fifth Amendment's privileges against self-incrimination and right to an attorney." *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005) (citing *Miranda*, 384 U.S. at 444). Nevertheless, law enforcement officers "are not required to administer *Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). *Miranda*'s requirements are applicable only where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Miranda*, 384 U.S. at 444).

"Two discrete inquiries are essential to the [custody] determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. Lebrun*, 363 F.3d 715, 720 (8th Cir. 2004) (citing *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). "Thus, the critical inquiry is not whether the interview took place in a coercive or police dominated environment [like a police station], but rather whether the defendant's 'freedom to depart was restricted in any way.'" *Id.* (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). To answer this question, courts consider the totality of the circumstances, "keeping in mind that the determination is based 'on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" *Id.* (quoting *Stansbury*, 511 U.S. at 322–23).

Usually, individuals temporarily detained during an ordinary traffic stop are not in custody for the purposes of *Miranda*. *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). In justifying this general rule, the Supreme Court provided that an ordinary traffic stop was more similar to an investigatory stop than a formal arrest for two reasons:

> First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief. The vast majority of roadside detentions last only a few minutes. A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way. In this respect, questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek.
>
> Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. To be sure, the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert some pressure on the detainee to respond to questions. But other aspects of the situation substantially offset these forces. Perhaps most importantly, the typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse. The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability. In short, the atmosphere surrounding an ordinary traffic stop is substantially less "police dominated" than that surrounding the kinds of interrogation at issue in *Miranda* itself, and in the subsequent cases in which we have applied *Miranda*.

*Id.* at 437–39 (internal citations and footnotes omitted). The Supreme Court further explained its reasoning, in a footnote:

> The brevity and spontaneity of an ordinary traffic stop also reduces the danger that the driver through subterfuge will be made to incriminate himself. One of the investigative techniques that *Miranda* was designed to guard against was the use by police of various kinds of trickery . . . to elicit confessions from suspects. A police officer who stops a suspect on the highway has little chance to develop or implement a plan of this sort.

*Id.* at 438 n.27 (internal citations omitted). The Supreme Court, however, explained that the general rule it announced will not apply when "a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, [and] he will be entitled to the full panoply of protections prescribed by *Miranda*." *Id.*

at 440. Thus, the Supreme Court acknowledged that lower courts would still be tasked with making the determination of "exactly when a suspect has been taken into custody." *Id.* at 441.

In *Berkemer*, the respondent had been stopped by police after he was observed weaving into and out of highway lanes. *Id.* at 423. When respondent exited his vehicle, the officer observed that he was having difficulty standing and the officer determined he would be charged with a traffic offense. *Id.* The officer then asked respondent to perform a field sobriety test; respondent failed the test. *Id.*

> While still at the scene of the traffic stop, [the officer] asked respondent whether he had been using intoxicants. Respondent replied that "he had consumed two beers and had smoked several joints of marijuana a short time before." Respondent's speech was slurred, and [the officer] had difficulty understanding him. [The officer] thereupon formally placed respondent under arrest and transported him [to jail.]
>
> At the jail, respondent was given an intoxilyzer test to determine the concentration of alcohol in his blood. The test did not detect any alcohol whatsoever in respondent's system. [The officer] then resumed questioning respondent in order to obtain information for inclusion in [his report]. Respondent answered affirmatively a question whether he had been drinking. When then asked if he was under the influence of alcohol, he said, "I guess, barely." . . .
>
> At no point in this sequence of events did [the officer] or anyone else tell respondent that he had a right to remain silent, to consult with an attorney, and to have an attorney appointed for him if he could not afford one.

*Id.* at 423–24 (internal citations and footnotes omitted). The Supreme Court held that the respondent should not have been given a *Miranda* warning prior to being placed under arrest because he was not in custody before then. *Id.* at 441–42. The Supreme Court found the respondent was not in custody for *Miranda* purposes because: (1) the initial stop of the respondent's car alone did not render him in custody, (2) between the initial stop and arrest the respondent had not shown he was "subjected to restraints comparable to those associated with formal arrest[,]" (3) only a small amount of time passed between the initial stop and the arrest;

and (4) "a single police officer asked respondent a modest number of questions and requested him to perform a simple balancing test at a location visible to passing motorists." *Id.* at 442.

The Eighth Circuit has applied the reasoning of *Berkemer* on multiple occasions. In *United States v. Rodriguez*, for example, a police officer asking an individual to exit his vehicle at a traffic stop was not the formal equivalent of arrest requiring a *Miranda* warning because the officer was temporarily detaining the individual to investigate his identity and to determine the status of a potential arrest warrant. 711 F.3d 928, 935 (8th Cir. 2013) *cert. denied*, 134 S. Ct. 715. In addition, the officer only asked the individual to exit the vehicle after noting he had reached around the car, looked at the officer, and told the officer he had a handgun in the car. *Id.* The officer handcuffed the individual, but told him that he was not under arrest. *Id.*

Likewise in *United States v. Morse*, the Eighth Circuit held that *Miranda* warnings were not required for a vehicle's passenger during a traffic stop when the passenger was asked to leave the vehicle after the driver was arrested so the officers could conduct a search incident to arrest and then gave incriminating statements when the police asked the passenger if he had anything the officer should know about. 569 F.3d 882, 883–84 (8th Cir. 2009). In making its decision, the court considered the fact that, "[the passenger] was never informed that his detention would not be temporary, and he was asked only a modest number of questions." *Id.* (internal quotations omitted).

In *United States v. Martin*, Martin was pulled over for a traffic violation, was given a citation, and then asked by the officer whether there was anything in the vehicle the officer should know about, Martin was nervous and responded no in slurred speech but the officer's dog alerted to the vehicle and Martin told another officer there was marijuana in his vehicle. 411 F.3d 998, 1000, 1000 (8th Cir. 2005). The Eighth Circuit held that a *Miranda* warning was not

9

required because Martin was not in custody. *Id.* at 1002–03. The whole time from citation to the drug dog's alert was approximately two minutes, during which time Martin was never told his detention would not be temporary and was only asked a modest number of questions by the two officers. *Id.*

Thus, officers effectuating a proper traffic stop may ask a moderate number of questions to dispel their reasonable suspicion of criminal activity as long as the questions do not significantly extend the duration of the traffic stop. *See United States v. Rivera*, 570 F.3d 1009, 1013 (8th Cir. 2009) (holding that an officer's questioning on matters unrelated to the traffic stop did not prolong the stop to make it a seizure because much of the extra time was caused by the individual's answers and language barriers not the officer's questioning on matters unrelated to the traffic violation). An officer "who has stopped a motorist based on probable cause 'does not violate the Fourth Amendment by asking a few questions about matters unrelated to the traffic violation, even if this conversation briefly extends the length of the detention.'" *Id.* at 1013 (quoting *Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007)).

Despite the general rule that individuals detained during an ordinary traffic stop are not in custody for the purposes of *Miranda*, Spack argues that the particular circumstances surrounding his statements to the Officers triggers his *Miranda* rights. Spack argues

> when both uniformed [O]fficers decided to approach the vehicle on each side, Mr. Spack clearly understood he was not free to leave. Instead of the [O]fficers asking questions attempting to elicit an incriminating response regarding whether there was 'anything illegal in the car', which was unrelated to the alleged probable cause the officers had for stopping the vehicle [failure to completely stop at a stop sign].

(Spack's Mem. in Supp. at 5). Spack asserts that the stop was out of the ordinary because the Officers did not ask for his license and registration, which would have provided Spack with the reasonable belief that he was not in custody but was just the subject of a traffic stop. (*Id.*).

Moreover, Spack contends that *Berkemer* is distinguishable because Spack was approached by two Officers while there was only one in *Berkemer*, and Spack was then questioned on matters that were unrelated to the reason for the traffic stop, which mirrors the post-arrest questioning in *Berkemer*. (*Id.* at 7–8). According to Spack, the Officers' questions were asked with the intent of obtaining incriminating statements from him. (*Id.* at 8).

The Court disagrees with Spack's arguments and finds Spack was not in custody for the purposes of *Miranda* when he provided his statements to the Officers. Whether Spack believed he was not free to leave while the Officers were questioning him at the traffic stop does **not** resolve whether he was in custody for *Miranda* purposes; the Court looks to the totality of the objective circumstances. *See Lebrun*, 363 F.3d at 720; *Morse*, 569 F.3d at 884. First, Government Exhibit 1 shows that the conversation between Spack and the Officers only lasted about three minutes before Spack was removed from his vehicle and placed in the back of the squad. (Gov't Ex. 1). Second, during this short amount of time, the Officers asked Spack a modest number of questions. Third, although the Officers asked questions unrelated to the traffic violation, these questions did not unreasonably prolong the traffic stop. *See Rivera*, 570 F.3d 1009, 1013. In fact, in other cases, the Eighth Circuit has explicitly allowed an inquiry into whether there was anything illegal in the vehicle at a traffic stop, even though this question was unrelated to the traffic violation. *See Martin*, 411 F.3d at 1002–03; *see also Morse*, 569 F.3d at 883–84 (asking by police of individual at traffic stop whether the individual had anything the officer should know about). Fourth, there is no showing Spack was ever told his detention would be anything but temporary. *See Martin*, 411 F.3d at 1002–03; *Morse*, 569 F.3d at 883–84. Thus, Spack was not entitled to a *Miranda* warning and his statements to Officers are admissible

because the Officers' questioning of Spack at the traffic stop did not trigger Spack's *Miranda* rights.

### B. Motion to Suppress Evidence

Spack further argues that items seized from his vehicle were derivative of his custodial interrogation and should be suppressed as the fruit of unlawful police action. (Spack's Mem. in Supp. at 8); *see Wong Sun v. United States*, 371 U.S. 471 (1963). Spack asserts that it was only after the Officers elicited incriminating statements from him that they searched the vehicle, making the decision to search the vehicle tainted by the statements Spack made under custodial interrogation. (Spack's Mem. in Supp. at 9).

The Court already determined Spack's statements were not the result of custodial interrogation, therefore, he was not entitled to a *Miranda* warning and his statements are admissible. The evidence seized after Spack's statements, thus, is also admissible and not "tainted" by unlawful custodial interrogation was Spack argues.

Spack initially argued in his Motion to Suppress Evidence that the search and seizure of the gun from his vehicle was unreasonable and illegal under *Arizona v. Gant*, 556 U.S. 332 (2009). (Mot. to Suppress Evidence at 2). Spack did not address his *Gant* argument in his supplemental briefing to the Court and did not file a reply. *See* (Spack's Mem. in Supp.); *See* (Supplemental Briefing Order at 2). The Government addressed *Gant* in its Response. (Gov't's Resp. at 6–7). Even though Spack failed to provide argument on the *Gant* issue he initially made in his Motion to Suppress Evidence, the Court will consider whether the gun found in Spack's vehicle must be suppressed under *Gant*. The extent of Spack's argument is that he

> was detained in the rear of the police squad car during the search of his vehicle. He was in police custody and not within reaching distance [of the] vehicle or the passenger compartment and therefore any future search and seizure of the weapon in question was unreasonable and illegal [under *Gant*].

12

(Mot. to Suppress Evidence at 2).

The Fourth Amendment provides for the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Because the Fourth Amendment prevents all unreasonable searches and seizures, all warrantless searches and seizures are invalid unless one of the few well-defined exceptions to the warrant requirement is satisfied. *Horton v. California*, 496 U.S. 128, 133 n.4 (1990) (citations omitted). In *Gant*, the Supreme Court held that police officers could not search the passenger compartment of a vehicle for their safety without a warrant after the securing of the scene of the stop. *Gant*, 556 U.S. 335. In addition, the Supreme Court held that police officers effectuating a traffic stop could only search a vehicle after arresting or detaining a suspect for evidence related to the offense for which the individual was arrested. *Id.* at 333–34. The *Gant* court also highlighted other established exceptions to the warrant requirement, including the following:

> If there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross* authorizes a search of any area of the vehicle in which the evidence might be found . . . . *Ross* allows searches for evidence relevant to offenses other than the offense of arrest, and the scope of the search authorized is broader.

*Id.* at 347 (2009).

Spack seems to argue that the search of his vehicle that yielded the gun was in violation of *Gant* because Spack was already secured in the squad at the time of the search. Spack, however, fails to acknowledge that at the time of the vehicle search, he had already told the Officers about the methamphetamine in his vehicle and the Officers observed scales commonly used for narcotics in the vehicles. *See* (Tr. at 10–15). The Officers, thus, had probable cause of criminal activity, which the *Gant* Court recognized gave the Officers authority to search the

vehicle further. *See Gant*, at 347. The search of Spack's vehicle, thus, was not illegal under *Gant*.

## IV. RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED:**

1. Spack's Motion for Suppression of Statements [Doc. No. 13] be **DENIED**; and

2. Spack's Motion to Suppress Evidence Obtained through Illegal Search and Seizure [Doc. No. 14] be **DENIED**.

Dated: April 23, 2014

*s/ Steven E. Rau*
Steven E. Rau
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **May 2, 2014**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.